UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6181-CR-HUCK
00-6324-CR-HUCK

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHN RAFFA,
    Defendant.
_____/

### NOTICE OF REQUEST FOR DEPARTURE FROM SENTENCING GUIDELINES

Pursuant to Southern District of Florida Local Rule 88.8(5), JOHN RAFFA ("Raffa"), will be asking the Court to depart downward from the sentencing guideline recommended by the Presentence Investigation Report ("PSI"). The PSI in this case did not identify any mitigating circumstances that might warrant a departure from the guidelines. (PSI section 28, page 10). The sentencing court has discretion to impose downward departures pursuant to specific guideline provisions or to go outside the guidelines in unusual cases involving circumstances not contemplated by the Sentencing Commission which promulgated the guidelines, see Section 5K2.0; 18 U.S.C. Section 3553(b). For the reasons which follow, Raffa, through undersigned counsel, respectfully submits that this is such a case, and requests a downward departure from the sentencing guidelines.



## FACTUAL BACKGROUND

In 1997, federal authorities began investigating co-defendant, Henry McFlicker, for alleged falsification of work visas for illegal immigrants. Almost three years later, on March 30, 2000, still not having effected the arrest of McFlicker for fraudulent immigration practices, the investigation, in part shifted to a money laundering sting. The central player in the sting was an undercover agent pretending to be a Russian who had a lot of cash from illegal activities that required concealment of its supposed illicit source. After the undercover agent rejected McFlicker's proposal for "laundering" the fictitious "dirty money", McFlicker indicated that he was not sure he could help the undercover agent and on April 7, 2000 McFlicker referred him to his friend, John Raffa. The very first time Raffa ever spoke with the uncover agent, Raffa explained that he was merely introducing the undercover agent to co-defendant, Michael Fuller, who would be the actual person arranging for the concealment of the currency's source. During that very first conversation, Raffa unequivocally advised the undercover agent that after the introduction, the agent would be dealing exclusively with Fuller. (Transcript of April 7, 2000 conversation; tape #14, page 5).[1] Raffa, aware that his friend Fuller's business was near bankruptcy and that Fuller was unable to pay the substantial medical bills incurred by his ailing wife, saw the cash laden undercover agent as someone who could help his distraught friend. Raffa and Fuller planned to make it appear that Fuller would "clean" the currency in need of concealment, while really using the money to rejuvenate Fuller's

---

[1] All references to transcripts are to those prepared by the defendant. The government has also submitted transcripts which vary in some respects.

near bankrupt business. Fuller even revealed to the undercover agent that the only reason that they were getting involved was that Fuller's wife was dying and in need of expensive medical care. (Transcript of April 10, 2000 conversation; tape #18, page 17 and Transcript of April 11, 2000 conversation; tape #19, page 20). In less than one week, without either ever having been previously involved in money laundering, Raffa and Fuller were arrested upon accepting one hundred thousand ($100,000) dollars from the undercover agent.

Subsequent to their arrest, the authorities secretly recorded Raffa and Fuller conversing in the back of a police car. The following highlights from that recorded conversation document the true intentions of Raffa and Fuller:

> RAFFA:   ... you're in a bad situation with your wife and trying to save your business and yeah, okay. I was trying to give you a one shot deal and you're done. You know. I was just.
>
> FULLER:  You were helping me.
>
> RAFFA:   Right...
>
> ...
>
> RAFFA:   And they're looking at me like I'm crazy and I said you know, I wasn't, I, I really wasn't getting anything out of it. They said well why you doing it.
>
> FULLER:  Well I, I told'em that was the truth, I told them that was the truth...
>
> ...
>
> FULLER:  ... He trying to help me out because my wife won't end up being eaten alive in a nursing home...
>
> ...

FULLER: I explained to him about the losses, how the business caved in. And (UI). (UI) I been trying to avoid what else is gonna happen. (UI) but there's no way that I can take care of Irene in the nursing home with all this going on.

...

FULLER: You're absolutely right John. We both had second thoughts ...

RAFFA: Yeah, to be honest with you (UI). I wasn't going to stick around for the business deal anymore so.

...

FULLER: I was trying to make myself look bigger.

RAFFA: Right.

FULLER: And he said well why weren't you gonna do it all? (handle more money) I said I didn't know what to do with it.

RAFFA: Yeah.

FULLER: That's the truth. I didn't know what to do.

...

FULLER: Well I didn't know what a hundred grand looked like that's why I got the big suitcase. (laughs)

RAFFA: Yeah.

...

FULLER: John, emotionally we've supported each other emotionally. You can't ask for a better friend. My wife is dying. You tried to come to my assistance, ah. We're trying to do right by her but that, you know, that put us in this situation and it's just destroyed both of our lives.

...

## MINOR ROLE IN THE OFFENSE

Guideline Section 3B1.2 provides for a decrease in the offense level based upon the defendant's role in the offense; if it is determined to be minimal (four level decrease) or minor (two level decrease). We submit that Raffa is entitled to at least a two level departure reduction for his minor role in this offense, when compared to the roles played by other co-conspirators. According to the commentary, paragraph one of Section 3B1.2 of the sentencing guidelines, the minimal role departure is "...intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." Commentary, paragraph 3 of Section 3B1.2 further provides that a minor participant departure is appropriate for those who are "...less culpable than most other participants but whose role could not be described as minimal." It is clear that unlike McFlicker and Fuller, Raffa lacked the ability to carry out any planned scheme to launder currency as evidenced by the undercover taped conversations. Raffa intended to introduce the undercover agent to Fuller and have no further involvement. If not stopped by reason of their arrest, it was Fuller, not Raffa that would have laundered the currency. Raffa's minor role is further supported by the fact that Fuller, not Raffa was the only one supposed to benefit from the scheme. Clearly, Raffa made the introduction and assisted Fuller solely to help a friend who was facing significant financial problems. Fuller, who was the only intended beneficiary of the conspiracy and who was the primary operative in carrying out the conspiracy's intended purpose, has already been sentenced by this Court to eight months of home detention followed by two years probation. This Court has the discretionary authority to consider Raffa's role in the offense as a whole, and to grant a

downward departure to ensure that Raffa's arguably minor role is not treated more harshly than his more involved co-defendant.

## FAMILY TIES AND RESPONSIBILITIES

Guideline Section 5H1.6 provides that "family ties and responsibilities... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." Relying on this guideline, courts have generally refused to permit downward departures for family ties absent extraordinary circumstances. However, as the First Circuit has indicated, "at some point, the nature and magnitude of family responsibilities... may transform the 'ordinary' case... into a case that is not at all ordinary." United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993). Extraordinary family circumstances can warrant a downward departure. The Third and Eighth Circuits, for example, have held that a court may depart downward where the defendant was solely responsible for the care of his mentally ill wife. United States v. Gaskill, 991 F.2d 82 (3rd Cir. 1993); United States v. Haversat, 22 F.3d 790 (8th Cir. 1994). Similarly, the First Circuit has upheld a downward departure based upon the regression that a defendant's child would suffer upon the defendant's incarceration. United States v. Sclamo, 997 F.2d 970 (1st Cir. 1993).

The garage of Raffa's home was converted into a bedroom to accommodate his elderly aunt, who suffers from dementia. Raffa is not only solely responsible for handling his aunt's financial affairs, he is her primary caretaker. (PSI paragraph 59, page 13). Raffa's 87 year old aunt has been living with Raffa and dependent upon his care since she and the family have been unable to afford the costs of

her former residence at an adult living facility. The primary physician for Raffa's aunt, Dr. Mitchell E. Goldstein, has opined that Raffa's aunt's well being is dependent upon Raffa's caretaker role. (Dr. Goldstein's letter is attached hereto and incorporated herein). In view of the apparent vulnerability of Raffa's aunt and the critical role Raffa plays as her caretaker, we submit that the needs of the public are not served by incarceration nor community confinement and a departure which affords Raffa the same opportunity for the nonincarcerative sentence received by his co-defendant, Fuller, would seem appropriate under guideline section 5H1.6.

### OUTSIDE THE HEARTLAND AND OTHER DEPARTURE GROUNDS

Guideline Section 5K2.0 provides for a decrease in the offense level if the court finds according to 18 U.S.C. Section 3553(b) "that there exists a ... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." The policy statement of guideline section 5K2.0 further provides that "The decision as to whether and to what extent departure is warranted rests with the sentencing court on a case specific basis... the court may depart from the guidelines, even though the reason for departure is taken into consideration in determining the guideline range... if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive... Finally, an offender characteristic or other circumstance that is, in the Commission's view 'not ordinarily relevant' in determining whether a sentence should be outside the applicable guideline range may be relevant to this determination if the

characteristic or circumstance is present to an unusual degree and distinguishes the case from the 'heartland' cases covered by the guidelines."

1.   Atypical Money Laundering.

Downward departures have been permitted in a number of cases where a defendant's conduct literally violated the money laundering statute, but fell outside the heartland cases covered by the money laundering guidelines. Downward departures have thus been upheld where a defendant's conduct was determined not to be "serious" money laundering as well as in a number of other atypical money laundering cases. United States v. Woods, 159 F.3d 1132 (8th Cir. 1998); United States v. Threadgill, 172 F.3d 357 (5th Cir. 1999); United States v. Skinner, 946 F.2d 176 (2nd Cir. 1991); United States v. Hemmingson, 157 F.3d 347 (5th Cir. 1998). One court has even approved a downward departure where the defendant, like Raffa, received no personal benefit from the money laundering, reasoning that the departure was justified under 5K2.0 because the money laundering guideline makes no mention of the failure to receive a personal benefit as a mitigating factor. United States v. Walters, 87 F.3d 663 (5th Cir. 1996).

2.   Sentence Disparity Between Co-defendants

If the Court rejects the plea agreement's stipulated recommendations and instead accepts the PSI's inflated guidelines calculation, there will exist a significant and unjustified disparity between otherwise similarly situated co-defendants. As noted in Defendant's Objections to Presentence Investigation Report, unlike Raffa, each of his co-defendants were given an opportunity to plead to superceding informations, which according to the probation department carried substantially reduced base offense levels.

Although, disparity between co-defendants has often been rejected as a proper basis for a downward departure, such unjustified disparities as here could potentially serve as a departure factor. United States v. Meza, 127 F.3d 545 (7th Cir. 1996). When, as in our case, there are special or exceptional circumstances, the courts have considered disparity in sentencing. United States v. Graham, 146 F.3d 6 (1st Cir. 1998), United States v. Banuelos-Rodriguez, 173 F.3d 741 (9th Cir. 1999).

3.   Aberrant Behavior.

Section 5K2.0 has also been used, prior to amendment, to justify departures based upon aberrant behavior. Relying partly on the language in the introduction to the Guidelines, courts have recognized that a downward departure may be appropriate where a defendant's crime is clearly aberrant behavior. The Sentencing Commission, effective November 1, 2000 amended the Guidelines expressly authorizing a sentence below the applicable guideline range in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior. (U.S.S.G. Section 5K2.20). The commentary to Section 5K2.20 specifically provides that in determining whether the court should depart on the basis of aberrant behavior, it may consider a number of factors including, the defendant's employment record, record of prior good work and motivation for committing the offense. It is clear from a reading of the PSI that Raffa is an ideal candidate for the application of this departure. United States v. Withrow, 85 F.3d 527 (11th Cir. 1996). Raffa, a first offender, became involved in the money laundering sting solely to help his financially troubled friend. It is clear that Raffa never was involved in money laundering activities prior to this sting and surely never will be again. His

involvement lasted less than a week and his intention was merely to introduce his friend and step aside.

4. <u>Combination of Multiple Factors.</u>

Effective November 1, 1994, the Sentencing Commission added a paragraph to the commentary to section 5K2.0 authorizing a departure downward based upon a combination of factors: "The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances, differs significantly from the 'heartland' cases covered by the Guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. However, the Commission believes that such cases will be extremely rare." (U.S.S.G. Section 5K2.0). We submit that this is such a case. Anyone of the departure grounds discussed above standing alone, should be sufficient to warrant a sentence reduction. The unique combination of all of these factors is even more compelling.

Respectfully submitted,

DAVID G. VINIKOOR, P.A.
Attorney for Defendant
420 S.E. 12th Street
Fort Lauderdale, FL 33316
Telephone: (954) 522-2500
Facsimile: (954) 522-7278

By: _____
DAVID G. VINIKOOR
FL BAR #195719

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Notice of Request for Departure from Sentencing Guidelines been furnished by U.S. Mail delivery this 14th day of March, 2001, to: Diana Fernandez, Assistant United States Attorney, 500 E. Broward Boulevard, Suite 700, Fort Lauderdale, FL 33301 and to Patricia Borah, U.S. Probation Officer, 501 S. Flagler Drive, 4th Floor, West Palm Beach, FL 33401-5912.

_____
DAVID G. VINIKOOR

ASSOCIATED
FAMILY
PHYSICIANS
OF BOCA RATON, PL

MARILYN B CABRAL
Administrator

MEDICAL STAFF

MITCHELL E. GOLDSTEIN, D.O., P.A
Board Certified in Family Medicine

LYNDA ALTMAN, M.D., P.A., F.A.A.F.P.
Board Certified in Family Medicine

OWEN A. BARROW, M.D., P.A.
Board Certified in Internal Medicine

DUSHYANT J. UTAMSINGH, M.D., PA.
Board Certified in Internal Medicine

STACIE L. GINSBERG, D.O., P.A.
Board Certified in Family Medicine

GAIL S STUDER, A.N.P.-C, M.S.N

MYRLENE M. ISMAEL-ALLEYNE, P.A.-C

February 5, 2001

RE: Rose Baione

Attention: Judge Huck

To Whom It May Concern:

Rose Baione has been my patient for many years. She is 87 years old and suffers from dementia as well as Osteoporosis with Acute Compression Fractures. Her nephew, John F. Raffa, is her primary caregiver and she is a member of his household. She relies heavily upon him for her needs. Therefore, his absence from the household would cause a severe hardship to her and would adversely effect her well being.
If you need any additional information, please do not hesitate to contact me.
Sincerely,

Mitchell E. Goldstein, D.O., P.A.

9910 SANDALFOOT BLVD., SUITE 1, BOCA RATON, FLORIDA 33428-6692
TELEPHONE (561) 883-3030 • FACSIMILE (561) 852-7611